Will the clerk please call the first case? 425-0455-WC Prairie Farms Dairy, appellant by Matthew Terry v. Illinois Workers' Compensation Comm'n et al., David Sampson, appellee by Omar Lopez. Counsel Terry, you may proceed. Good morning. May it please the court, counsel, I am Matt Terry and represent the appellant, this matter. Here the arbitrator got this case right and the commission got this case wrong. The standard of review before the court today on compensability is de novo because we're here to determine whether Mr. Sampson's actions removed him from the course and scope of his employment as a matter of law. As you know, commission decisions on questions of law are reviewed de novo and it is a question of law whether Mr. Sampson in this case placed himself in a position that his injury resulted from a risk purely personal to him and not incidental to or connected with what he had to do to fulfill his job duties. Now, turning to the facts of this case, let's look at what happened here. Supplemental Exhibit 5, which was Respondent's Exhibit 4 at the trial before the arbitrator, that shows the vantage point of what Mr. Sampson saw at the time he was injured in that video, right before he stuck his hand in the machine. Now, we're here because his actions were so egregious that his actions went beyond the course and scope of his employment. Pointing now going to talk about the egregiousness of his actions, the first point I'd like to make is he received a verbal warning the day before for doing the same thing on a different machine at my client's facility. Number two, his position was a maintenance worker. He was not an operator or a line worker or some common employee within the facility. He was someone who had knowledge of the machine at issue, and he was hired to fix things and fix machines like this machine. Number three, his training was extensive on his job as a maintenance worker. He received and reviewed the initial safety rules. He received hands-on training for quite some time and as well as the lockout tagout training. Number four, he actually testified on direct examination that when any machine requires, quote, any sort of fixing to them, end quote, they must be turned off. Let me, let me stop you for one, let me stop you for one second, please. Sure. You, could you elaborate on, tell us how long he had his, his training? I think they describe it or you describe it as shadowing. You said it was extensive training. I'm just wondering how long did he have to shadow other operators or maintenance people before he was allowed to, you know, do things on his own? So, the shadowing kind of was, was, was, I guess the whole time he was a maintenance worker, and he began working in maintenance in early 2016. So, the shadowing, the shadowing was like an everyday thing, the hands-on, that's what you're referring to, that was basically under Steve Opie, who was the head of maintenance. So, that was like an ongoing, so that was like an ongoing, you have a question, you can ask Mr. Opie. So, that was an ongoing thing, and this accident was in May of 2018. So, at least over two years of the hands-on, the initial safety rules was when he was hired, actually, whenever he was hired by the employer, and then the, the lockout tagout training, that was the alchemy training, that was the modules that were in evidence at trial. So, that was the, that was the alchemy training, lockout tagout was the specific one where you, what, I don't know if you were, your justices are familiar with that, you lock, locking and tagging out a machine is turning it off, it's called lockout, and then you tag it out, this is off, I'm going to work on it, and that went for various machines throughout the facility. Right, and there was some training that was required by OSHA afterwards that required them to essentially disconnect the power once somebody was out there working on a machine, is that correct? Yes, so there was the, the lockout tagout went into the disconnecting the machine power, if you're going to work on the machines, you turn them off, and specifically this machine, turning it off before you perform the repair on a machine like this, and like I mentioned the night before, he was on a different machine in the same room, it's called the trimmer machine, that machine was caught with the guard up, there was a guard that he had put up and he was making the repair on that machine the night before, so he was warned, so he knew he was not supposed to run it in an operation. Although that's disputed, he doesn't recall having that conversation or being reprimanded for that, right? He said he did not remember having the conversation with Kyle Hanson, correct, that's what he said, and then there was the verbal warning was memorialized shortly afterwards, but the verbal warning, Mr. Hanson said he told him, hey don't do that, don't stick your hand in that machine the night before this accident. Okay, thank you. Sure, now this specific repair issue, again shutting the machine down, that was Jason Emery, who's the plant manager, Steve Opie, who I mentioned was the maintenance manager, and Jason Price, who was another maintenance operator, and then Kyle Hanson, who was a shift supervisor, they all testified that whenever you repair, make this specific repair, you shut down the machine, and even Mr. Sampson's own witness, Blaine Parnum, supported this as well in his testimony, and you know, turning more to get number, that's number five, number six, it's really unbelievable to me why he didn't turn this down, because all you had to do was press a button, and the machine stops within three or four seconds. Now the exhibit that was submitted, the accident video exhibit that was submitted at trial by both parties, that showed that the machine, that showed after he hurt his hand, or hurt his, got his hand in the machine, then that video showed the machine turning off almost instantaneously, and then only, again, the startup time, it's only a few minutes to, to repair the, make the repair, and then restart the machine, and that's, and Jason Emery testified about that, Steve Opie testified, and Jason Price, and last point on the why it was, to me, it's so unbelievable he did not do what he was supposed to do in this circumstance, after this accident, the machine was down for six hours, and Jason Price was called back to the facility after they got everything cleaned up, and restarted the machine within one to two minutes, so it was a very, very quick uh, way to turn on the machine, make the repair, and then turn it back on. Number seven, um, Mr. Sampson testified that he, about this making a quick fix on machines, but he was, but no one asked him to do that that night, and Kyle Hanson was not even aware he was, he was working on the blow mold machine that, that night. Number eight, and this is the last point of the egregiousness, um, the video from supplement exhibit five, when, uh, again, like I mentioned, he saw what, and he said, he testified at trial, it was dangerous, he knew he could get his hand caught in this machine, um, by doing what he did, so as far as the law goes, when an employee violates a safety rule that is purely for his own personal convenience, and isn't required by or benefits his employer, then he is barred from benefits. Now, turning to, um, what I anticipate Mr. Sampson's counsel will, will, uh, talk about today, the commission had written, quote, petitioner's actions were done with the intent to further employer's interests, i.e. avoiding a lengthy and costly shutdown, as I mentioned, that's untrue and ignores the overwhelming evidence submitted at trial. This evidence is Jason Price's testimony, who, by the way, uh, he was neither employed by Prairie Farms at trial, and his name is not listed anywhere in the commission decision. The commission decision did not mention Jason Price's name at all in that, in their decision, and like I just mentioned, Mr. Price restarted this machine after the accident, it only took a minute or two, despite being down for six hours. Furthermore, Jason Emery, who's a plant manager, and Steve Opie testified, the machine restarts immediately or within a few minutes of being shut down. Now, another issue that I know the, the justices and, um, and I anticipate Mr. Sampson's attorney will mention about, um, Mr. Sampson was performing work that was part of his employment, he was hired to do, benefited, benefited my client and did not personally benefit him, but that ignores two significant things. The, Prairie Farms did not hire Mr. Sampson to perform work that violated their safety rules. Those rules exist and are enforced to protect everyone in the facility, including Mr. Sampson, and the second point is this hurt the employer's production because the machine was down for six hours, so there was no production being performed for those six hours that the machine was down. Now, turning to the case law, and I know counsel, uh, in their brief cited case law, and I'm sure you're familiar with these cases, uh, your honors, but as far as the benefit, that goes to the Saunders and Lumaji cases, um, both employers in those cases, they did not reap a benefit, um, from those violations, and my client didn't reap a benefit here either, and as far as the work being performed, Lumaji specifically flushes this out for a better word, in Lumaji, the, was that motor, using a motor to get to the other side of the mill or the mine, um, they, they were, he was able to, they were in both circumstances, in both cases, the claimants were performing job duties, but they were both engaged in a hazardous, hazardous method of doing so when their job duties required a safer manner to do so, and the third point from the case law, the job description, Saunders mentioned this in their analysis that, you know, then Saunders, they were allowed to use a forklift, but they weren't allowed to use it how they did in that case, so in, in, in this case, he was not supposed to stick his hand in a moving machine while he was working on it, um, and Saunders distinctly said that's really not, there was no significance to actually being in the job description, so Mr., for example, Mr. Sampson, in his job description was to work on machines, but in Saunders, they were supposed to use forklifts, but just not use it in the manner in which they did so, so I'd ask the, uh, your honors to, um, for those reasons and other reasons mentioned in my briefs, uh, to reverse and vacate the decision of the commission awarding benefits, um, and if I may, uh, the last thing I wanted to discuss, and it was fleshed out more in, I guess, my reply brief than anything, but another issue that came up, um, based on the commission decision, because they should be entitled to a credit for the statutory amputation of the, of the right little finger against the ultimate PPD awarded, and this court, um, recent, I know recently addressed this issue in your opinion from February 26th in the Ascon Metals case, um, that was an opinion issued by Justice Barberis, uh, 250301 WC, which is, since it was so new, I'm sure everybody's so familiar with it, but, um, basically, in that case, there was a, there was a statutory amputation for the um, and which ended up, should have been for the leg, I know that was fleshed out in the, uh, in the decision, but anyways, so the, the total weeks awarded are going to be credited, uh, for the employer in that case, and they should be here. As far as this, the weeks awarded by the commission, as you saw, they awarded a total of 75.78 weeks. That breaks down per A20 ILCS 305 8Es and Edgar to 100% of the right little finger, that's 22 weeks, and that's E5, 25% of the hand, that's 51.25 weeks, that's E9, and 1% of the right arm, 2.53 weeks, that's E10. So, I'd ask the court if, I guess if you disagreed with everything I said before we started talking about the PPD credit aspect of this case, I'd ask for the court for a specific finding that the total weeks owed are not 75.78, but 53.78, once you do the math from those specific statutory provisions. If you don't have any other questions, thank you for your time, and I will be back for rebuttal after Mr. Lopez proceeds. Any questions from the bench? Yes. Council, I guess I'm a little concerned about the idea that the standard of review is de novo, and, you know, it seems to me there's too, even if we assume all the facts are undisputed, or the most material facts are undisputed, aren't there different inferences to be drawn from the facts? I don't think so. I think the only, here's why. Well, the issue is, did he, was this a personal benefit? What was his goal here? Right, and I think the personal, the, as far as the benefit goes, it definitely didn't benefit my client, because my client was hurt. Well, no, I get what you're saying. I mean, that's your point of view, but I'm saying that was disputed. My concern is the inference is disputed, and so, therefore, then we get to manifest weight. I guess if the court does find, I guess, to answer your first question, I went through all the cases in the standard review, because I know this was very important, and the Hines case, I think, is fairly instructive on, which I said in my brief, that they talk about the mixed question of law and fact, and I think, based on the wording in the Hines case, that a safety rule violation is an analysis that comes with the de novo standard of review, because you're determining whether, as a matter of law, and now, I understand, if you have a medical opinion, right, there's Dr. Smith versus Dr. Jones, that's a factual issue, and it would manifest weight, absolutely, but here, whenever you're dealing with a safety rule, specifically, the Hines case, I think, really explains this in detail of whenever you have a safety rule violation case, then that is a de novo review, and as far as the disputed facts, it potentially disputed a reasonable inferences in this case. I mean, I don't really see, I guess, the only, the one that the commission held on to, I guess, that you would, the best argument, if I was the other side, the best argument is, there's a disputed fact of how long this machine gets shut down, right? That is the one that the commission really honed in on and really talked about was, hey, how long does it take for this machine? And Mr. Sampson said, well, it can take up to, what, 45 minutes or an hour, it was a substantial period of time. Well, one thing the Hines case talks about was, you have to have a well-supported factual finding, whereas I don't think that's really a well-supported factual finding, and here's why, with all the evidence that shows otherwise, and not only that, so we have somebody testify one way and somebody testify the other way, right? But going further, Jason Price, after this accident, restarted the machine and it fired right back up. So as far as that being a factual dispute, I think I used this analogy in the circuit court, or at least I thought about it, was, if somebody who testifies that the sun rises... I guess the one thing I'd say is, to the extent the Hines case speaks to a standard of review, it says, commission decision be set aside only if the factual findings are contrary to the manifest weight. I mean, you're right in that it does make that sort of ambiguous statement. I personally think that was the court's way of saying, all right, well, now we talked about the facts, let's look at the law here on employees who break laws. And, you know, another question, if you don't mind, is like, so every time an employee breaks a rule, there's no compensation? No, and I do not think that's... Well, if they break the rule for their convenience, because it makes their job easier. Well, I think... There's a personal goal and it's not in the scope. Does that carry it too far, do you think? Does that statement carry your position too far? I think, yes, yes, Your Honor, I think it does. All right, and one last question. Was there an appendix? Did you file an appendix? Yes. Because I didn't receive either a printed copy when I looked at the queue in, you know, our case management system. Oh, yeah, it was filed. It was actually filed. I didn't actually see it. Yeah, it was filed with, whenever we check with the clerk, we filed it as one whole document. We filed the brief. It's attached to the brief as one whole document, and that's what we were instructed to do. Because I checked into that as to whether it needs to be separate, and then we were told, my staff was, to file it as one whole document. So that's why it's... So it was filed on April or August 4th. I guess we just didn't print it all out. Excuse me. Thank you for doing that. But to answer your question, just one last one thing, as far as the second to last question you just asked, I think it's a sliding... I mean, I think it's, for lack of a better word, like a scale. Then you look at the egregiousness, and just because somebody doesn't do what their employer says, I think they could still be entitled to benefits. I think in this case, and that's why I hit on the egregiousness points, those eight points, I think this is a case that takes that scale, that slides towards a scale of non-compensability where, you know, you can have cases where somebody just didn't follow the rules, but I think this, all the facts of this case lean towards non-compensability based on all that. I have a question regarding your handbook that employees are given. In your experience, are all employee handbooks written with that type of readability, comprehensibility in it? It seemed like this was a pretty basic handbook in terms of language understanding. Like, you mean like turning the machine off and lockout, tagout, and like, you know, not working with... Are you referring to the handbook sections of the safety rules of whether and whether initially hired? Yes. Right. Yeah, I mean, I think it's... I think this is a pretty standard. I can't speak for like all facilities or all employers, but, you know, this was, you know, in this kind of factory setting with these kind of machines, you know, I can't speak for other employers, but I mean, this, it seems like it's pretty straightforward to turn the machine off before you work on it. And, you know, without sending somebody, I guess, without giving somebody a manual that's 500 pages for every single intricacy, which, you know, I guess I can't think of a situation I've seen. I think, you know, them and they also, I think employees also have a chance to, if you have any questions about what does this mean? I mean, it's an open door as far as I'm concerned is the, you know, they can come to the employer, they can come to their supervisor. Hey, do I do it here? Do I not do it there? And I think in this case, it was clear. And even without his own testimony, Mr. Sampson's own testimony, that was clear. He needed to shut this machine down in order to make this repair to this area of the machine. Okay. Thank you. No further questions. You'll have time in reply, Mr. Terry. Okay. Thank you. Mr. Lopez, you may respond. Your honors, may it please the court. My name is Omar Lopez. I'm counsel for the appellee, Mr. Sampson. This honorable court should affirm the lower court's ruling to uphold the commission's decision for the following four reasons. First, Mr. Sampson sustained a compensable injury because the record contains sufficient evidence that he remained within the sphere of his employment throughout his workplace accident, despite his role violation. Secondly, Mr. Sampson's award of total temporary disability for 33 and 3 7 weeks is proper, given that he was unable to work from May 18, 2018 to January 6, 2019 due to his compensable injury. Third, the commission correctly awarded Mr. Sampson 75.78 weeks of permanent partial disability since he suffered an amputated right fifth digit and hurt his hand, which are separate and distinct injuries under the Illinois Workers' Compensation Act. Finally, the court's award of medical bills incurred by Mr. Sampson for his compensable injury was correct, as they could have plausibly inferred that the blood work undergone by Mr. Sampson on December 18, 2018 was related to his work-related injury, since it was contemporaneous with his physical therapy for his hand. However, as a preliminary matter, this court should apply the manifest weight of evidence standard when reviewing the commission's finding that Mr. Sampson's injury arose out of his employment, as the lower court properly did, because the issue of whether Mr. Sampson's injury arose out of employment, as presented to this court, is a factual determination involving disputed material facts. As noted by the court in Hines, whether employment-related acts contributed to the cause of injury can be a mixed question of fact or law. However, the Illinois Supreme Court's decision in Republic Iron provides that when an employee's injury involves a violation of a safety rule or instruction, the positive issue in determining whether the injury arose out of employment is whether the employee remained within the sphere of his employment. This often calls for a fact-intensive inquiry, as various considerations may be relevant in determining whether an employee remained within the sphere of their employment. As such, no bright-line rule exists, and the application of Republic Iron relies on the circumstances surrounding the employee's injury. Following that, the Illinois Supreme Court has expressly noted that the commission's findings from evidence presented should not be reversed unless they are against the manifest weight of the evidence standard. Reviewing courts applying this standard are highly differential to the commission's fact-finding when evaluating conflicting evidence, so much so that courts are not to substitute their own judgment for the commission's or disregard the commission's permissible inference simply because other inferences could be drawn. Instead, a reviewing court must find that the commission's decision is clearly contrary to the manifest weight of evidence to set aside the commission's decision. Accordingly, the central test under the manifest weight of evidence standard is whether the record contains sufficient evidence to support the commission's decision. In determining whether an employee remained within the sphere of their employment under Republic Iron, reviewing courts apply the manifest weight of evidence standard unless material facts are undisputed. For example, in Saunders, there were material factual disputes regarding how the employee was injured, the safety rule at issue, and whether the violation was employment-related or for personal convenience. Thus, the court applied the manifest weight of evidence standard when reviewing the decision that the employee's safety violation situated outside the sphere of his employment because of those material factual disputes. Courts reviewing the commission's decision on whether an employee remained within the sphere of their employment have applied a de novo review standard of review only when the material facts are undisputed, and this is highlighted in Hines, which the appellant incorrectly relies on, because the court decided the legal question after noting that the material facts had been clearly established. Similarly, in Yost, the reviewing court made its decision de novo because there was no factual disputes given that the only person to testify was the employee. Thus, de novo review of the commission's decision on whether an employee remained within the sphere of their employment despite a safety rule violation is appropriate only when the material facts are undisputed. Here, the specific question of whether Mr. Sampson remained within the sphere of his employment is factual, and this is highlighted by the party's existing disagreement over whether Mr. Sampson was pursuing his assigned repair duties when he violated the safety rule and whether he did so to benefit the employer, both of which were factual determinations that the commission made and relied on when finding in Mr. Sampson's favor. For instance, both parties presented conflicted evidence concerning whether Sampson made his repair to avoid delaying production, whether the employer had permitted employees to leave machines on during certain repairs, whether Prairie adequately trained its employees on the lockout procedure. As the lower court noted, the arbitrator and the commission. Therefore, the material factual disputes in this case call for this court to review the commission's decision on whether Mr. Sampson's injury arose out of his employment under the manifest weight of evidence standard. Moreover, this honorable court to affirm the commission's decision that Mr. Sampson's injury arose out of employment because there is sufficient evidence supporting that he remained within the sphere of his employment throughout his workplace accident despite his safety rule violation. Under the Illinois Workers' Compensation Act, an employee sustains a compensable injury upon being exposed to a risk that is either incidental to or connected to their job duties. As previously mentioned, a workplace injury involving the rule violation remains compensable so long as the employee remained within the sphere of employment under a public iron. Courts applying this ruling have consistently recognized that employees whose injuries involve a safety rule violation remain within the sphere of their employment when they are performing their assigned duties, which are tasks that the employees are required to do or hired to do. For example, in J.S. Mason area, bricklayer's assistant tripped while carrying materials and fell about four meters from an unsecured rail that his employer's owner had instructed him to fasten. Despite violating that instruction, the court held that the injury was compensable because he was performing his assigned duties when delivering materials on the established scaffold. Similarly, in Hines, the claimant negligently attempted to access a sub-basement through a hatchway rather than using instructed alternatives that the employee even acknowledged were available to him and he was ultimately hurt. Nonetheless, the court still found that the employee was within the sphere of his employment because he was trying to comply with his employer's directive. In Republic Iron, the employee's death was deemed compensable even if he violated the employer's instruction and had not taken the stair cart to perform his assigned task of delivering mail. Together, these cases establish an employee remains within the sphere of their employment when injured despite a rule violation so long as they are performing their assigned task. Here, as the employees in Republic Iron Hines and JS Masonary, Mr. Sampson remained within the sphere of his employment because he was injured during the performance of an assigned duty and it's undisputable that Mr. Sampson was employed as a maintenance worker and one of his responsibilities was repairing machines as needed which included the blow mold machine. It is also undisputed that Mr. Sampson was trying to repair the blow mold machine when he placed the masking tape on the plastic tubes and subsequently put his hand in the tube into the machine. Mr. Lopez, could you, I know you have a lot to get through here, but could you slow down just a bit just so I can absorb some of it? Okay, we'll do. Sorry, your honor. No, no, Mr. Lopez. Yeah, I agree with Justice Kavanaugh on Mr. Lopez. Can you recall the case where the employee was hitching a ride, so to speak, on a industrial machine to go from point A to point B? Are you familiar with the facts of that case? Are you talking about the case that I was previously talking about? No, no, no, no, but you're going through it so fast. Just that particular case. Okay, so I think Republic Iron is the case that I mentioned as far as there was a dispute on whether the employee had listened to the employer's instruction to deliver mail using a steer car and the employer disputed that the employee, because the employee ultimately got hit by a railroad, and the employer disputed... No, that's not the case. The case is where the employee hitches a ride on a machine going from point A to point B. He's not an operator of the machine. He's going from point A to point B. I'm not familiar with that case, your honor. Oh, okay. Well, we're trying to outline, determine the boundaries of sphere, being within the sphere of the employment. How do you define that? I think these cases that I cited to previously make it clear as far as the scope, and ultimately what the courts applying Republic Iron have determined was when the employee is performing their required task, something that they're required to do or hired to do, and they are injured, they remain within the sphere of their employment despite them violating some instruction or rules set forth by the employer. And in this case where Mr. Sampson had placed the plastic tubes on and put his hand and the tube in the machine, which ultimately resulted in his injury, it would fall within these category of cases because he's performing a duty that Prairie had ultimately hired him for, which was repairing these machines. And what's more notable is that unlike the employee in Heinz, Mr. Sampson intended to protect his employer's interest when he committed the safety violation because he wanted to avoid a shutdown. And this intent and furtherance of his work-related objective, rather than a personal convenience in Heinz, which was to avoid appearing foolish and further supports that his conduct fell within the sphere of employment. Accordingly, Mr. Sampson remained within the sphere of his employment because he was performing his assigned repair duty and violated, only violated the rule to protect Prairie's interest. So that's... Mr. Lopez, I think Mr. Terry is saying that your client's conduct was so egregious that it takes it out of his scope of employment. And two, that the employer did not actually benefit in the end from what he did. So as far as, as far as the egregiousness of the rule violation, Mr. Sampson's rule violation, well, first I would like to note that the Illinois courts have never recognized the employee's contributory negligence, even recklessness when the employee is performing a required duty. And we see that in Republic Iron with the employee, whether he took, whether he walked across the train tracks or J.S. Mason area, whether when he failed to fasten the horizontal rail in Heinz, when he was aware of the alternative available routes to get to this, this patch that were available to him. And in all those cases, the court never really considered the recklessness or the negligence of the employee because the employee was performing their required duty, just as Mr. Sampson was in this case. And perhaps the most illustrative example of the insignificance of contributory negligence when the employee is performing their required duty can be found in Union Colliery Company versus Industrial Commission. And this is a case that was decided a year before Republic Iron. In that case, the employee violated the Illinois statute, which was the Mining Act, which ultimately led to his death. Nonetheless, the court did not give a lot of didn't consider the fact that he violated the statute when finding that the employee would remain within the sphere of their employment. So in other words, well, that's axiomatic. That's why we have a workers' compensation act. That was the that was the grand bargain between an employer and employee is the erasure of contributory negligence. So you're saying as long as you're there at the job, doing the job the employee hired you for, work rules don't matter? Correct. And in cases in which the the employee's violation does matter, such as in Saunders or Lumagi, in those cases, the employee, the employees were injured while violating rules, performing tasks that were not required for them to perform by their employee, by their boundary. Then, according to your analysis, is the question of egregiousness is not even relevant. In this case, it would not be relevant because the is there a case where it would be relevant? There is. And we see that in Lumagi where the mine examiner is trying is going to the motors that are expressly reserved for motor men and that he's prohibited from entering that 600 feet from the work site. In that case, the egregiousness would matter because he was not hired to ride the motor. Instead, he was hired to examine mine sites. In Saunders, the forklift operator was. In other words, yeah, I know there's all these facts about all these cases, but if we're talking about the law generally, as long as you're doing the job that you were to do. Negligence, recklessness are irrelevant. That is that is correct, your honor. That is that is our position. Well, isn't that a much simpler analysis under cases establishing that? Correct, I think. Correct, I do think that that's a that's a very simple analysis. However, I think that with the cases do when you look at Lumagi Saunders is J.S. Masonary, Heinz, and Republic Iron is really set forth that that scale when you know the employees performing their required test. You know the egregiousness doesn't matter when the employees not performing their required tests or something that they're hired to do. Egregiousness could matter, and that's what that's what the case law. It could matter. Let's take away that bright line rule. It could matter if they're doing something that is not required for them to do by their employer. So that's a factual issue, isn't it? Correct. The commission did determine. Correct. And in this case, the commission did determine that what Mr. Mr. Saunders was doing was against the manifest weight of the evidence or not. The the determination. The commission's determination is not against the manifest weight of evidence. If there's because there's sufficient evidence to support the commission's finding that Mr. Samson was performing an assigned task and ultimately was injured in the his injury arose out of his employment. And something I would like to note about the cases in which the so a safety violation, as long as they were within that. Boundary area is really not even worth printing. Correct in something that's notable about this case that you don't see in the cases in which the court has found the employees injury to rise out of employment is that there is a level of practical acceptance. And in this in that in this case, that is namely that there was there were four of seven witnesses, including the respondents own witness that testified that machines weren't shut off when certain repairs were being done. And ultimately, that presence of practical acceptance, acceptability undermines the appellant's claim that the conduct was so egregious as to remove him from the scope of his employment. Okay, your time is up. Yes. Are there any further questions from the bench? No, hearing none. Okay. Thank you. Mr. Terry, you may reply. Thank you, Justice Holdridge. A couple things that the case regarding from going to point A point B that your honor had inquired about, I believe this is the Saunders cases is what you're talking about. That's the hitching the ride on the forklift. And then, you know, and as I was thinking about this and writing my notes here, Lamar, he's kind of in Lamar and Saunders are the main ones I'm arguing today. The Lamar case dealt with the using that motor to get to another part of the plan or mine or facility or whatever. Now, you'd ask several questions about the the required tasks. And I kind of mentioned this on my initial argument. But as far as the work being performed in Lumagee, Lumagee was using was performing job duties, but doing so in a hazardous hazardous, sorry, method when the job is required a safer manner to do so. So I think Lumagee is very instructive in this case, as well as Saunders, because in Saunders, the job description that the employee had in Saunders was to their part of their job was to use forklifts. They use the forklift in incorrectly and not how they were supposed to. So both of those cases, I think support there's there's not a bright line rule on, you know, safety violations, and the work rules still do matter. The so I think those two cases are very instructive, because I really flesh this out when going through the cases of the Are you doing a work task or not? And I think that if you look at Saunders and Lumagee, you just because you're doing a work test is not automatically me. But what was the job? Let's go back to that. Okay. What was the injured employee hired to do? And in this case? No. And Saunders. And part of his job duties was to operate forklifts in Saunders to my understanding. So, but he was injured not while he was operating a forklift. Correct. Well, he hitched a ride on the forklift. It's a ride. Someone else was operating the forklift. Right. And they talked about how part of his job was to operate forklifts. But yes, wasn't operating the forklift in that if that's what you're asking. He was not he was not the one driving the forklift. If I remember the case, right. He hopped on a ride whenever he but he was familiar with how to use a fork. And they talked about how he was familiar with how to use a forklift and how he did his his using this forklift and whatever way shape or form he did use it was, you know, beyond negligence and removing from the course of scope of his employment. And the as far as the so I don't forget to mention this, the permanent partial disability for the hand. I believe the reading of the medical records is is this is the reason why a hand was awarded was because of the injury to the finger because Mr. Sampson had a pre before this accident, he had another amputation to another finger on his hand. So he basically had two and a half fingers left. And so that's why the hand was awarded. There wasn't like a specific additional injury to the hand based on the medical. It just it's kind of now they do talk about irrigation debridement of the hand because they're closing that wound and on the on the digit that was lost. And then he had some cuts on the fourth finger. But so I just wanted to mention that as well. So I do believe that my client should be entitled to a credit for those weeks that I mentioned earlier over the ultimate. So I asked for the court for a specific finding that the the the specific weeks that are awarded if compensability is determined to be compensable. As far as again, the last thing I wanted to mention, this egregiousness standard, as I started to mention towards the end of my initial argument, I do think and go back to justices. Justice Mullen, I believe, had the question. I think it's a scale. I think it's a you can have somebody be negligent. You can have somebody, you know, that's still compensable. And it's still a compensable case sometimes if somebody gets injured and they're not doing what they're supposed to. But I think all the factors that I mentioned, all eight of them, they just add up. They add up to make this case the case that's not compensable, where other cases would be based on all the egregiousness and the substantial evidence in this case. So if your honors have any questions, I welcome them. If not, I thank you for your time today. And that's it. Questions from the court. Did the employee here seek a wage differential under AD? No. There was no idea. No, that's my understanding that there was just a tried on the, you know, the upper extremity aspect of the case. Does PAETA apply then? I think it does. And your honor, PAETA, well, so PAETA is AD1. And then ASCON Medals. I mean, ASCON Medals was all about AD1, AD2. Correct. Yes. And so I think that's this. So here we have an eight, you know, if, for example, I can make it easier. It's actually simpler. I think if you had a hand case, I think if you just have a hand case, or you lose two fingers, say you lose two fingers and then that makes it a hand case. Say you amputate two fingers instead of just one, then that automatically makes it a the pinky and the ring finger on a case. Then you are entitled to a credit towards, for the statutory amputation, a credit towards the overall award for the hand. And that's basically my analogy here is at the end of the day, it's if the statutory amputation is awarded in the ultimate permanent partial disability benefits that are awarded on the case. If that's the case, then I think you're entitled to a credit or my client's entitled to a credit for those overall weeks that were awarded based on PAETA and ASCON Medals. Okay. Thank you, counsel, both for your arguments in this matter this morning. It will be taken under advisement and a written disposition shall issue at this time. The clerk of our court will escort you from our remote courtroom and we'll proceed to the next case. Thank you.